THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BARBARA AVERY, Defendant-Appellant.

First District (3rd Division)    No. 79-165

Opinion filed September 17, 1980.

James J. Doherty, Public Defender, of Chicago (Dennis J. Sopata and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Barbara Avery, was charged with the murder of her infant daughter, Tomika Avery. After a trial without a jury, defendant was found guilty of that charge and was sentenced to a term of 20 to 30 years. On appeal, defendant contends that the State failed to prove that confessions made by defendant were knowingly and voluntarily made, and that the State failed to prove the *corpus delicti* of murder *aliunde* the confession.

Tomika Avery, 38 days old, was last seen at approximately 10 p.m. on June 18, 1977. On June 23, 1977, defendant gave statements in which she admitted dropping Tomika into a garbage compacter chute on June 18. By agreement of the parties, the trial court heard defendant's motion to suppress the statements during trial. The motion was denied. The pertinent facts are as follows.

After defendant's brother called the police on June 23, Officer Lawrence Trunko of the Chicago police department talked to defendant and her mother, Precious Smith. Defendant told the officer that she had an accident with Tomika and had dropped the baby down the chute at her aunt's apartment at 220 East 63d Street in Chicago. At the apartment, defendant described how the baby fell down the chute. Defendant stated that she was attempting to hold the baby and dispose of diapers. When the diaper was thrown in, the baby slipped in too. The officer had no difficulty communicating with defendant. She was not crying and was responsive to all his inquiries.

Officers Michael Pochordo and Patrick Seery investigated the incident and described the chute. It had a door which opened and closed manually. The door had no mechanism that would automatically close it. Refuse and objects deposited through the door would enter the shaft and drop into a hydraulic piston holding area where it would be compacted into a container for garbage pick-ups. The compacted garbage was picked up on each weekday. The officers talked to defendant and her relatives, and she

explained the accidental dropping of the baby. The officers asked defendant if it would be convenient for her to accompany them to the police station to give a statement about the incident. At that time, defendant was not a suspect in a criminal offense and was not under arrest.

As they reached the police vehicle, defendant vomited. The police officers asked if she wished to stay home, but defendant said she was all right and would go to the police station. When they arrived at the police station, defendant again vomited. She declined the officers' invitation to take her to a doctor or hospital and stated she would be all right. Defendant then gave a statement describing how the baby accidentally fell into the chute from the second floor. She told her mother the baby was with the father because she was afraid to tell her mother what had happened. After defendant signed the statement, the officers conferred with her relatives and with an assistant State's Attorney.

The officers then informed defendant of her *Miranda* rights and asked defendant if she understood those rights. When she replied that she did, the officers told defendant that her statement contained inconsistencies and asked her to tell what really happened. Defendant agreed that her statement was inaccurate and stated that on June 18, she wanted to attend a dance or carnival. She was unable to find a babysitter for Tomika, and could not find any place to put Tomika. Defendant was also tired of her family bothering her about the baby. She then placed Tomika in the chute and closed the door. Defendant agreed to repeat the statement to an assistant State's Attorney and court reporter. At approximately 7:45 p.m., defendant was again read her *Miranda* rights and indicated that she understood. She then repeated her statement to an assistant State's Attorney and court reporter. The statement was reduced to writing and defendant made four corrections before signing the statement. The officers testified that no one harassed or coerced defendant into giving the statement, and that she was responsive to questions asked by the officers.

Irving Miller, an assistant State's Attorney, testified that he arrived at the police station at approximately 5:30 p.m. on June 23, and was informed that defendant was a suspect in the disappearance of her baby. Miller testified he was aware that defendant had vomited and asked her how she was feeling. Defendant replied that she was all right and feeling better. After defendant was informed of her rights, defendant stated that she understood her rights and wished to make a statement. Defendant gave an oral statement detailing the incident. In the statement, defendant said she was 17 years old and attended school to the ninth grade. She could read and write English and was not under the influence of drugs or alcoholic beverages. After relating her efforts to get someone to babysit Tomika, she stated that she sat outside the 63d Street building. Defendant took the infant to the fifth floor and then to the second floor incinerator where she opened the

door to the chute and put the infant inside. Defendant then closed the door. She opened the door and saw that the baby had fallen down the chute. Defendant went to the first floor but was unable to see the baby in the chute. She stated that she then went home. Miller asked her if she wished anything to eat or drink, and defendant requested and received a soft drink. Defendant gave the same statement to a court reporter. Miller testified that defendant was not coerced and he had no difficulties in communicating with her.

Edward Nemetz, an assistant State's Attorney, testified that he asked defendant to read, correct and sign the written statement which she had given. He observed defendant read the statement and make corrections before signing it. Nemetz testified that defendant was outgoing and not reluctant to talk to him.

After defendant gave them the statements, the officers traveled to a landfill site where the compacted trash from the building in question was dumped. The garbage, when dumped, is chopped by machine to spread and level the refuse and is then compacted against a 20' by 500' clay wall. Additional clay is then spread over the top and sides of the refuse and again crushed. The officers searched the landfill site on three occasions but were unable to locate any trace of the baby.

Dr. Robert Stein, the Cook County medical examiner, inspected the trash compactor unit and the landfill site. Dr. Stein testified that in his opinion if a 38-day-old infant was dropped into the trash compactor unit in the building in question and the unit was in good working order, and the infant was compacted with garbage and transported in its compacted state to the landfill site, treated by the compacting equipment and covered with clay, the infant could not survive. Dr. Stein also stated that if six days passed before a search was conducted to locate human remains or tissue for purposes of identification or cause of death, it would be impossible to identify any remains or tissue because of marked decomposition and tissue laceration. Portions or parts of clothing could still be in existence.

Mrs. Precious Smith, defendant's mother, testified for the State that on June 19, 1977, she inquired as to the infant's whereabouts. Defendant replied that the baby was with Tomika's father. On June 23, defendant told her mother that the baby was dead. Octavia Clash, defendant's aunt, testified for the State that on June 18 she had instructed defendant to look after her baby and stay home. She saw defendant with Tomika entering a neighbor's apartment across the hall. The apartments were separated by the trash chute. On June 22, defendant told the witness she had taken the baby to the apartment of defendant's mother. Rochelle Austin, a neighbor, testified for the State that on June 18 defendant attempted to have her babysit Tomika. When she refused, defendant left with the baby. On June 19, defendant told the witness that her aunt had the baby; on June 20,

defendant said that the baby was with Tomika's father. Deborah Austin testified that defendant told her the baby was with a friend. The custodian of the 63d Street building testified that the trash compactor was in good working order on June 18.

Dr. Lawrence G. Freedman, a psychiatrist, was the only defense witness. He had examined defendant on two separate occasions. He determined that the defendant was of marginal intelligence, between the lowest level of normal to the top level of a mild mental deficiency with an IQ of 78. Dr. Freedman diagnosed defendant as having a personality disorder, inadequate schizoid. It was not regarded as a major psychosis, but in a stressful situation, such as police interrogation, defendant would be extremely suggestible and affirmatively responsive to the verbal and behavioral suggestions of authority figures to a degree beyond rationality and self-interest, and would to the best of her ability attempt to assent to police queries. She understood the words lawyer and silence when informed of her rights but would not have long range comprehension of what was involved.

Defendant initially contends that the State failed to prove that her confessions were voluntarily made. She maintains that the trial court erred in finding that she voluntarily and knowingly waived her right to be silent.

The test for the admission of a confession is whether it was made freely, voluntarily, and without compulsion. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 393 N.E.2d 1098.) The burden of proving that a confession is voluntary rests upon the State. (*People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 160.) The voluntary nature of the confession must be proved by a preponderance of the evidence. *People v. Harper* (1967), 36 Ill. 2d 398, 223 N.E.2d 841.

■■ Defendant maintains that her age, intelligence, physical condition, and psychological make-up, coupled with the stress of a police interrogation, caused her to be extremely vulnerable to coercive influences and highly suggestible. Receipt of an incriminating statement from a juvenile is a sensitive concern. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) Juvenile confessions are to be carefully reviewed to ensure that such confessions are voluntary and not coerced, suggested, or the end result of a juvenile's ignorance of rights, adolescent fantasy, fright, or despair. (*In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; *People v. Kincaid* (1977), 51 Ill. App. 3d 975, 367 N.E.2d 456.) The voluntariness of a juvenile's confession is to be determined from the totality of circumstances. *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672.

■■■ A review of the totality of the circumstances in the present case requires the conclusion that defendant knowingly and intelligently waived

her right to remain silent and that the confession was voluntarily given. The mental capacity of a defendant must be taken into consideration in determining whether a confession was voluntary. (*People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27.) It is only one factor, however, in determining the voluntary nature of a confession from the totality of circumstances. (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383.) Subnormal mentality, in itself, does not render a defendant's confession involuntary so long as the subnormality has not deprived the defendant of the capacity to understand the meaning and effect of the confession. (*People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466.) Here, defendant arrived at the police station at approximately 4:30 p.m. and gave a statement that the baby's fall was accidental. Shortly thereafter, defendant gave another oral statement implicating herself and admitting that she deliberately placed Tomika in the trash chute. Prior to giving this statement, defendant was given her *Miranda* rights. She stated that she understood these rights. She also stated that she had a 9th grade education and could read and write English. She was not under the influence of drugs or alcoholic beverages. She declined medical attention for her upset stomach and repeatedly said that she was all right. At approximately 7:45 p.m., defendant again was read her *Miranda* rights, and she repeated her incriminating statement to an assistant State's Attorney and court reporter. At about 10:30 p.m., defendant made corrections and signed each page of her statement. She was not subjected to an unreasonable or lengthy interrogation and was not deprived of food or drink. The evidence indicated that defendant's rights were carefully explained and that she clearly understood the meaning and effect of her confession. Moreover, the record is devoid of evidence reflecting that the police officers or prosecutors made suggestions to defendant as to what occurred or that the confession was not voluntarily given. Strong evidence that defendant was not as passive or suggestible as she now claims is supplied by her own statement. The questions she was asked were not particularly leading. Both in answering them and in other matters defendant could and did say no to the authorities present. Moreover, before signing the statement she read it carefully and corrected it in four respects. This was not the act of someone blindly following the suggestions of others. The trial court's finding that defendant waived her right to remain silent and that the confession was voluntarily made was not against the manifest weight of the evidence.

Defendant next contends that the State failed to prove the *corpus delicti* of murder *aliunde* the confession.

An extrajudicial confession, in itself, is insufficient to support a conviction unless corroborated by other evidence. (*People v. Melquist* (1962), 26 Ill. 2d 22, 185 N.E.2d 825, *cert. denied* (1963), 372 U.S. 967, 10 L. Ed. 2d 130, 83 S. Ct. 1093.) The *corpus delicti*, however, need not be proved beyond a

reasonable doubt exclusively by evidence *aliunde* the confession. (*People v. Perfecto* (1962), 26 Ill. 2d 228, 186 N.E.2d 258.) While a conviction may not be based upon an extrajudicial confession alone, the other evidence need not be sufficient by itself to connect defendant to the offense. (*People v. Holmes* (1977), 67 Ill. 2d 236, 367 N.E.2d 663.) It is enough if the evidence other than the confession either tends to show that a crime did in fact occur, that is, to establish the *corpus delicti* (*People v. Norcutt* (1970), 44 Ill. 2d 256, 255 N.E.2d 442), or otherwise sufficiently corroborates the confession in its material elements to satisfy the court that the confession was not the product of·imagination. (See *People v. O'Neil* (1960), 18 Ill. 2d 461, 165 N.E.2d 319.) The *corpus delicti* in a criminal homicide consists of two elements: the fact of death, and the fact that the death was produced by the criminal agency of some person. *People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.

■■ Defendant maintains that since no body was recovered and no testimony was elicited at trial which directly proved the death of Tomika, the State failed to prove the fact of death. We hold, however, that under the circumstances of the present case, the proof of fact of death did not require the production of the body or direct proof of death. In *Campbell v. People* (1895), 159 Ill. 9, 42 N.E. 123, the State was unable to introduce any direct evidence proving the death of the baby in a prosecution for the murder of the child. The supreme court recognized that in some cases of criminal homicide, and especially infanticide, direct proof of death would be difficult and not required. The court concluded that the fact of death, for purposes of proving the *corpus delicti*, may be proved by circumstantial evidence in such cases. Other jurisdictions have reached the same conclusion. *People v. Cullen* (1951), 37 Cal. 2d 614, 234 P.2d 1; *State v. Snowden* (Fla. App. 1977), 345 So. 2d 856; *Warmke v. Commonwealth* (1944), 297 Ky. 649, 180 S.W.2d 872; *State v. Zarinsky* (1976), 143 N.J. Super. 35, 362 A.2d 611; *State v. Dudley* (1969), 19 Ohio App. 2d 14, 249 N.E.2d 536; *Commonwealth v. Lettrich* (1943), 346 Pa. 497, 31 A.2d 155; *State v. Lung* (1967), 70 Wash. 2d 365, 423 P.2d 72; but see *People v. Kirby* (1923), 223 Mich. 440, 194 N.W. 142.

In addition to the total disappearance of Tomika, there were the conflicting stories defendant told her family as to the child's whereabouts. All these facts and circumstances sufficiently established the fact of death.

Defendant also maintains there was no evidence other than the confession which proved a criminal agency. Defendant's false statements and actions following Tomika's disappearance could have been intended by defendant only to divert suspicion or postpone discovery of the crime. The evidence demonstrates criminal agency as well as the fact of death.

■■ In any event, defendant's actions toward Tomika and the circumstan-

ces before she dropped the baby related in her confession were corroborated by the testimony of her relatives and friends. Their testimony concerning the whereabouts of both the defendant and the baby in the proximity of the incinerator prior to Tomika's disappearance corresponded closely with defendant's statement. That corroboration is enough to support the confession. It was proper, therefore, to consider the confession, and all the evidence including the confession, was sufficient to prove defendant's guilt beyond a reasonable doubt.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

SIMON and RIZZI, JJ., concur.