THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICHARD V. TOTH, Defendant-Appellant.

Fifth District    No. 80-72

Opinion filed April 16, 1982.

John H. Reid and Thomas W. Mansfield, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

David Hauptmann, State's Attorney, of Harrisburg (Martin N. Ashley and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Richard Vincient Toth was charged by information with murder for the May 8, 1979, killing of Carole Cooley. He was convicted by a jury of murder on November 27, 1979. He was sentenced on January 31, 1980, to a term of life in prison. On appeal from the conviction and sentence he raises a number of issues. We affirm the trial court.

Richard Toth called the sheriff's department of Saline County on the afternoon of May 8, 1979, to report that he had been mugged near Karel Park in rural Saline County. Chief Deputy Norman Wilson drove out to investigate and was struck by some oddities in the report, but searched for over an hour in the neighborhood for a van and occupants as described by Toth.

Wilson returned to the jail where he received a report of an apparent drowning near Raleigh, about two miles from Karel Park. He went out to investigate and determined that it was a possible homicide because of marks on the body. Wilson told Sheriff George Henley, who was investigating the death, about the mugging report and his suspicions about it. Henley sent Wilson to Toth's house to see if Toth would come to the scene and talk with the sheriff. Wilson and Reserve Deputy James Dunn drove to Toth's house in a squad car. Wilson told Toth that he had something that might interest him and asked whether he would mind going with them. Toth went back into the house to get shoes, then came out and accompanied the officers to the Cooley farm. Toth sat in the back of the squad car, since the radio console only permitted space for two in the front seat. The rear of the car had been adapted for transporting prisoners, with a screen between the front and back and no inside door handles. On the way to the farm Wilson and Toth talked about general subjects such as the weather and "how everything was going." There was conflicting testimony at a hearing on a motion to suppress regarding the subject of a red baseball-type cap. Both Wilson and Toth agreed that they talked about Toth's owning one and having lost it that day, but they disagreed about who initiated the subject. Wilson testified that he did not say anything to Sheriff Henley about the discussion of the cap.

When they reached the Cooley farm, Toth remained in the back of the squad car. Reserve Deputy Dunn stood outside, near the car. Deputy Wilson went to tell Sheriff Henley that Toth had arrived. Toth was not told that he was under arrest. He asked Dunn if he could get out of the car since it was getting hot. Instead, Dunn rolled down the front window to let in cooler air.

Some minutes after Toth had arrived at the scene, Sheriff Henley asked Eldorado Police Chief Glen Barrall to take the defendant to the courthouse. Because of the confusion at the investigation scene, the hot weather, and the delay before he could discuss the "mugging" with Toth, the sheriff thought it better that Toth be taken back to the courthouse. When Barrall asked the sheriff whether the defendant should be jailed, Henley said that he should not. Barrall was to ask Toth to wait in the dispatcher's room or in the booking room, and to tell Toth that the sheriff would be up soon.

When Barrall asked Toth to go with him to the county jail, the defendant said that he would. Toth blurted out to Barrall that a cap lying 75 to 100 feet away at the scene was his cap. Both Chief Barrall and the defendant agreed that the comment was not prompted by Barrall, but was volunteered, or in Toth's words, "out of the blue." Barrall reported the remark to Sheriff Henley, then drove Toth to the courthouse. Sheriff Henley testified later that he was surprised by the remark. As he thought it over, and the fact that it seemed to place Toth at the scene, he decided that Toth should be arrested. He telephoned the jail and instructed the jailers to place Toth in a cell when he arrived at the courthouse.

That evening, about 7 p.m., Sheriff Henley and Special Agent Jack Nolen from the State Department of Law Enforcement, talked with Toth in the Saline County jail. Nolen advised Toth of his rights under *Miranda* (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and Toth agreed to talk to the two officers. He made a statement which indicated he killed Carole Cooley, but that she had started an altercation which got out of hand by trying to seduce him.

On appeal the defendant challenges the court's denial of his motion to suppress. In his motion he alleged that he was under arrest from the time he was transported from his home to the Cooley farm (approximately 5:40 p.m.), and that he was not given his *Miranda* warnings until 7 p.m. at the Saline County jail. In addition Toth alleged that Wilson started the conversation about his hat in the car before they got to the farm. His position is that the information about the hat was self-incriminating and led to his making the statement, therefore both the admissions regarding the hat and the statement should be suppressed.

A review of the events leading up to the defendant's arrest at the jail makes it apparent that he was not placed under arrest, as he contends,

either when Deputy Wilson gave him a ride from his house to the homicide scene, or when he arrived at the scene. Neither Deputy Wilson nor Reserve Deputy Dunn regarded himself as going to arrest the defendant. Wilson's suggestion that the defendant return to the Cooley farm was couched in language appropriate to a request rather than a command and the defendant was free to refuse. As the trial court noted, had the deputies intended to arrest Toth for murder, it seems unlikely that they would have waited calmly outside while he disappeared into the house "to get his shoes" and closed the door behind him. Deputy Wilson testified positively that he would never have permitted the defendant to do so had he been under arrest, and further testified that if Toth had been arrested for murder, Wilson would have read him his rights, searched him, and handcuffed him. None of this was done.

■■■ It must be remembered that the defendant initiated the first contact with police authorities on May 8, 1979, when he called in the report of the "mugging." He testified at the hearing on the motion to suppress that he thought the police would think the muggers did the killing of Carole Cooley. It is entirely consistent with that thought that he agreed to accompany the officers to help them with their investigation in answering questions, not because he believed he was under arrest. Toth was entitled to be warned of his right to remain silent when he was arrested, but not before. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612.) Even if he were under arrest, volunteered statements are not covered by *Miranda*.

> "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.

■■ At the hearing on the defendant's motion to suppress confession the trial court heard conflicting testimony regarding the first conversation about the cap. Also, the defendant testified that he was not given his *Miranda* warnings until after he made an oral statement. Sheriff Henley testified that Jack Nolen gave Toth the *Miranda* warnings at the jail before any questioning began. The trial court had the advantage of being able to observe the demeanor of the witnesses and to weigh their testimony and assess their credibility. "Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact." (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733, 735.) We will not substitute our judgment for that of the trial court and therefore affirm the denial of the motion to suppress.

Defendant maintains that the court erred in refusing to instruct the jury on voluntary manslaughter as a lesser included offense. The defendant tendered instructions on voluntary manslaughter under two

theories, both that he acted under a sudden and intense passion resulting from serious provocation by the deceased (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(a)), and that he believed that circumstances existed which would justify the killing but the belief was unreasonable (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b)).

The evidence of what happened at the Cooley farm on May 8, 1979, came from two primary sources: the statement made by the defendant and the testimony of the pathologist. The defendant said that after conversation about fishing in the pond and the way the farm looked compared to when the defendant's grandparents had owned it, "Charlie" Cooley began hinting around that she wanted the defendant to "screw" her. She asked him to come into the house. He refused. She became angry and tried to hit him in the face with a paint brush she had been using to paint a swing set. She missed his face but got his arm with the green paint. He slapped her in the face and knocked her to the ground. She got up and he asked her for a glass of water. She was very angry, but went into the house and got him a glass of water. After he drank the water and set the glass down the argument started again. When he again refused to go into the house with her and "screw" she pulled a serrated steak knife from her rear pocket. He reached for the knife and she cut him on the inside left arm. He took hold of her arm with the knife and they fell to the ground, wrestling. She bit him on the right arm and she clawed and scratched him. He got the knife away from her and struck her "a few times" as they were on the ground. They kept fighting and ended up down by the farm pond. She said, "look what you did to me I'm bleeding to death." He did not say anything. He carried her out a few feet into the pond and tossed her face down into the water. He did not know whether she was dead or alive when he tossed her into the water. He said he did not know how many times he stabbed her, and "It was either me or her."

The examining pathologist, Dr. A. J. Venables, performed an autopsy on the body of Carole Cooley the evening of May 8, 1979. He counted 20 stab wounds which were fresh. Most were not very deep, but a few were as deep as four inches. One had punctured a lung and the equivalent of two units of blood had collected in her lungs. He testified that none of the wounds was fatal, although she may very well have fainted from the loss of blood. The amount of blood she lost was twice that which was capable of causing fainting. Dr. Venables testified that the cause of Carole Cooley's death was drowning. This was indicated, among other things, by hemorrhage into the mastoid sinuses, something characteristic of drowning but of no other cause of death.

The submitted instructions on voluntary manslaughter by sudden and intense provocation do not find support in the record:

"The testimony falls far short of the reasonable, adequate provo-

cation required to reduce murder to manslaughter while in the heat of passion. The test is objective, not subjective. The inquiry is not as to whether the defendant was angry at someone or about something at the time he * * * killed the deceased. The question to be asked is whether there existed such provocation as would have caused the state of mind claimed in an ordinary person under the same circumstances." *People v. Matthews* (1974), 21 Ill. App. 3d 249, 252, 314 N.E.2d 15, 18, *appeal denied* (1974), 57 Ill. 2d 605.

■■ Even if "Charlie" Cooley tried to seduce the defendant, hit him with a paint brush, and brandished a steak knife at him, an ordinary person under the same circumstances would not have concluded, "it was me or her." Sufficient provocation did not exist to reduce the murder charge to voluntary manslaughter by reason of sudden and intense passion.

The defendant tendered instructions regarding self-defense which were submitted to the jury, over objection by the State.

The defendant contends that it was error for the court to refuse to instruct the jury on manslaughter under the theory of an unreasonable belief that force was justified, when it did submit instructions that the defendant must be acquitted if the jury found that he had a reasonable belief that force was justified. The defendant cites the Illinois Supreme Court in the case of *People v. Lockett* (1980), 82 Ill. 2d 546, 553, 413 N.E.2d 378, 382:

"The judge's duty is to determine if any evidence is presented that the defendant had a subjective belief. We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable. * * * Consequently, we hold that when the evidence supports submitting an instruction on justifiable use of force, a tendered IPI Criminal No. 7.05 on voluntary manslaughter should also be given."

We agree that self-defense and voluntary manslaughter based on an unreasonable belief of justification are two sides of the same coin. However, in the case before us we must remember the sequence of events. The defendant's altercation with Carole Cooley and his conclusion that "it was me or her" happened first. He took the knife away from her and stabbed her repeatedly, causing blood loss and her comment that "I am bleeding to death." But in fact she was not bleeding to death, as determined by the pathologist. If she had been left by the edge of the pond when she apparently passed out, the wounds would not have been fatal. At the time when the "wrestling" and stabbing stopped at the edge of the pond, whether she was yet unconscious or not, Carole Cooley was no threat to Richard

Vincient Toth. He could not have thought, at that point, that "it was either me or her." Therefore, his actions in throwing her face down into the pond, from which she was unable to extricate herself, could not have been in self-defense. There was no evidence of circumstances to create the belief, albeit unreasonable, that throwing Carole Cooley in the pond was necessary to prevent defendant's suffering imminent death or great bodily harm. *People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829, 831.

The trial court commented at the hearing on the post-trial motion that perhaps it should not have submitted the self-defense instructions to the jury. We agree that it should not have. The record does not support self-defense in connection with the drowning. The self-defense instructions were error, but under the circumstances were harmless. The court was correct, however, in refusing the instructions on voluntary manslaughter through unreasonable belief in justification.

Defendant urges the court to reverse the verdict based on alleged partiality of one of the jurors, Richard Weatherly. Weatherly was selected after defendant had exercised all of his peremptory challenges and the court declined to dismiss him for cause. Weatherly indicated on *voir dire* that he had a "speaking" not a "social" acquaintance with the prosecutor and that he had operated the radio in the sheriff's department once or twice. Weatherly did not get paid for operating the radio or work any kind of schedule with it. Weatherly was a barber, who had cut the defendant's hair when he was a child, and was "interested in operating radios." He had gone down to the sheriff's office "when they had their school." Weatherly was "not a special deputy or anything like that." He testified that he did not have a preformed opinion about the case.

The defendant cites the case of *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, which reversed a murder conviction based on the lack of an impartial jury. The court in *Irvin v. Dowd* stated that "findings of impartiality should be set aside only where prejudice is 'manifest' " (366 U.S. 717, 724, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643) and

> "The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside." (366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1643.)

The court went on to find that the challenger in *Irvin v. Dowd* had met the burden of showing a biased jury.

> "Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to

him, some going so far as to say that it would take evidence to overcome their belief." *(Irvin v. Dowd* (1961), 366 U.S. 717, 728, 6 L. Ed. 2d 751, 759, 81 S. Ct. 1639, 1645.)

In the case at bar, the challenged juror said he could be impartial, that he did not have a preformed opinion of guilt or innocence, that he had not discussed the case with the deputies at the sheriff's office "whoever they are," and that he had had contact with the defendant as a child, as well as with some of the witnesses for the State. The trial court, in declining to excuse Weatherly for cause, found that he was an impartial juror. We do not find that the defendant has met his burden of an affirmative showing of partiality and find no error in the trial court's refusal to dismiss Weatherly for cause.

"The determination of the trial court as to the competency of the juror should not be set aside unless it is against the manifest weight of the evidence, which, we conclude, it is not." *People v. Cole* (1973), 54 Ill. 2d 401, 415, 298 N.E.2d 705, 713.

The defendant states that the court erred in allowing into evidence a photograph of the victim, Carole Cooley, taken while she was still alive. Carole Cooley's husband testified at trial regarding the fact that she was alive on the morning of May 8, 1979, when he last saw her. He described her appearance and identified a snapshot of her, taken about a year before her death, which included him and a child and older woman in the photo.

Defense counsel objected to the admission of the photo into evidence, and the trial court ordered that the pictures of the three other people, including the child, be "redacted" before he allowed it into evidence. The State stapled white paper over the other people's pictures and encased the whole thing in clear plastic, stapled together. The court admonished the jury not to try to take the exhibit apart.

The defendant complains that it is possible to see the shadowy outlines of the other three people if the exhibit is held to the light. We have examined the exhibit and the record and are satisfied that the trial court acted properly with regard to the photo.

■■ It is well established that the State is entitled to call "life and death" witnesses to establish that the victim of a homicide had been alive prior to the events at issue. *(People v. Speck* (1968), 41 Ill. 2d 177, 201, 242 N.E.2d 208, 221, *rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.) Such evidence is admissible even when it is introduced through the testmony of a close relative who loses his composure. *(People v. Bost* (1980), 80 Ill. App. 3d 933, 952, 400 N.E.2d 734, 749.) The photo, which Fred Cooley testified accurately depicted what Carole Cooley looked like on the day of her death, merely illustrated his testimony. It did not serve to inflame the passions of the jury. The court's care in obscuring

the other figures in the photograph reduced the possibility of undue emphasis on the fact that Carole Cooley left a family. (*People v. Bernette* (1964), 30 Ill. 2d 359, 371, 197 N.E.2d 436, 443.) We find no error in the admission of the photograph.

The defendant contends that he was deprived of a fair trial by the prosecutor's closing argument. He alleges that the argument was calculated in part to arouse the sympathies of the jury and implied to the jury that it must, as a matter of community responsibility, convict the defendant. He also alleges that the prosecutor voiced his own opinion as to the defendant's guilt and commented upon the defendant's failure to testify.

We have reviewed the record in this cause and find these points not well taken. No objection was made to the prosecutor's comments at trial except one in reference to the husband of the deceased. None of the comments was raised in defendant's post-trial motion.

> "Generally, irregularities in the prosecutor's closing arguments not objected to in the trial court (*People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Gunner* (1979), 73 Ill. App. 3d 533, 392 N.E.2d 165), as well as those not particularly set forth in the written post-trial motion (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856), are deemed waived and do not require reversal." *People v. Eckles* (1980), 83 Ill. App. 3d 292, 299-300, 404 N.E.2d 358, 364.

When taken in their context, the prosecutor's comments did not call undue attention to the fact that the defendant did not testify. In this case the defendant's version of the happenings was before the jury through the mechanism of his statement to the police which was introduced by the State. Therefore, when the prosecutor argued that "no one came forward and said the defendant did not stab Carole Cooley" he was not committing reversible error. The defendant had, in his statement, admitted that he had stabbed Carole Cooley. That point was not at issue.

> "Closing arguments will be considered in their entirety, and the record as a whole must be examined to determine if reversible error was committed in this respect. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 525, 368 N.E.2d 528, 532.) As a rule, the prosecutor is to be given a great deal of latitude in making his closing argument. *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847, 852." *People v. Eckles* (1980), 83 Ill. App. 3d 292, 300, 404 N.E.2d 358, 365.

The defendant did object at trial, during closing argument, to the prosecutor's reference to Fred Cooley, the surviving spouse of the victim. The objection was sustained and the prosecutor abandoned the subject. We cannot say that the remarks "were so prejudicial that defendant did

not receive a fair trial." *People v. Eckles* (1980), 83 Ill. App. 3d 292, 300, 404 N.E.2d 358, 367.

Defendant argues that the natural life sentencing provision is unconstitutionally vague (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)). He acknowledges that this court specifically addressed the question in *People v. Merchel* (1980), 91 Ill. App. 3d 285, 414 N.E.2d 804, and held the statute constitutional, but urges that we re-examine our ruling. Since the time this case was argued, the Illinois Supreme Court has denied leave to appeal in *Merchel*.

In addition, defendant argues that the life sentencing provision is unconstitutional because it does not allow the offender to be restored to useful citizenship, as espoused by the Illinois Constitution, article I, section 11:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Defendant cites *People v. La Pointe* (1980), 85 Ill. App. 3d 215, 407 N.E.2d 196, which held the statute unconstitutional. However, the Illinois Supreme Court reversed the appellate court in *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344, and held the statute to be constitutional. We therefore find no error in the trial court's use of the natural life sentencing provision.

Accordingly, we affirm the judgment and the sentence.

JONES and HARRISON, JJ., concur.