THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS P. STANLEY, Defendant-Appellant.

First District (5th Division)   No. 85—0307

Opinion filed August 22, 1986.

James J. Doherty, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Paula M. Carstensen, and Terrence J. Griffin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following convictions in a bench trial of murder, aggravated kidnaping, concealment of a homicidal death and unlawful restraint, defendant was sentenced to concurrent terms of 30 years for murder and 3 years for concealment of a homicidal death, but defendant was not sentenced on the convictions for aggravated kidnaping and unlawful restraint. On appeal, defendant contends that: (1) the cause of death was not proved beyond a reasonable doubt; (2) his conduct constituted, at most, voluntary manslaughter; and (3) his 30-year sentence for murder was excessive.

The victim's stepfather testified that the 15-year-old victim was about 5 feet 4 inches, weighed 120 pounds and was in good health.

The victim's mother testified that although defendant asked her on April 24, 1983, whether her daughter could go with him to a teen club meeting and that he left after being told that her daughter could not go, she subsequently learned that there was no teen club meeting that evening. Her daughter went over to Lisa McCurdy's house shortly thereafter to show her some new clothes.

Lisa McCurdy testified that she was a close friend of the victim and lived across the street from her. On April 24, 1983, the victim came to her home with some clothes to show her. She left about 8:15 p.m. to leave her clothes and purse at home but returned a few min-

utes later and told Lisa that she was going with defendant to meet someone named Jim who had escaped from a juvenile home.

Officer McQuaid, a special agent for the Department of Law Enforcement, testified that on May 5, 1983, he observed the body of a white female being removed from the Cal-Sag Channel. On November 9, 1983, at about 4:30 p.m., he was with defendant and Detective Adamski at the police station when defendant stated that he would take them to 138th and Division to show them where he placed the victim's body on April 24, 1983. Defendant showed them where Gregory Tarala had stopped his car and the wooded area about 30 feet from the road to which defendant and Tarala carried the victim's body. Defendant told him that from that point he carried the victim's body for another 100 yards to the shoreline of the Cal-Sag River where he covered her with leaves and branches and then he showed them where he later placed the body into the river. Officer McQuaid drew circles on a map to show the locations pointed out by defendant and the place where the body was eventually recovered. He stated also that the area where Gregory Tarala stopped the car is the Little Calumet River and that river flows into the channel. The victim's body was nude when it was discovered, and they did not find any clothes in the area.

Dr. Lee Beamer, who performed the post-mortem examination on the victim, testified that her "death was caused due to drowning, or asphyxia," which he said is a general term which simply means the absence of oxygen. Drowning is a form of asphyxia, which could also result from choking on a piece of meat or having an arm compressed against a person's neck. Based on his examination, he could not determine whether the victim's death was caused by choking or by drowning because both were consistent with his observations. On cross-examination, he stated that the victim had no abrasions or lacerations and, while he did not find any human hair or flesh embedded in her fingers, he believed that he did not take any fingernail scrapings. On his report he indicated that drowning was the cause of death. He found no internal or external injuries to her neck and while he listed drowning as the cause of death, he indicated that the manner of death was undetermined. He stated that drowning is a nonspecific diagnosis, a diagnosis of exclusion, and the drowning could be homicidal, suicidal or accidental. He listed the relevant types of asphyxia as: ligature strangulation; manual strangulation, or strangulation with the hands; chest compression, in which the individual is unable to draw air into the lungs; and compression of the neck, perhaps by an arm. He found no marks of a material wound around the neck causing a constriction which would be evidence of ligature strangulation nor did he find any indentation or

fingernail marks which would be characteristic of manual strangulation and compression of the neck. He found nothing that allowed him to rule out either drowning or compression of the neck.

James Reilly, the assistant State's Attorney who interviewed defendant in a room at the Markham courthouse on November 9, 1983, testified that defendant freely discussed the incident and subsequently gave a court-reported statement which he summarized as follows:

"He went to the victim's (Laura) house at approximately 8:00 p.m. on April 24, 1983, to see whether she could go out with him. He met her at approximately 8:30 p.m. behind her girlfriend's house. After they walked through the alley and cut through several yards, Laura asked him whether he "had anything" that she could "get high off." He gave her either a red pill or a "robin's egg." He had a can of beer that evening but he was sober at the time. After Laura took the pill, they began to argue and fight because Laura complained about the lousy taste of the pill. He hit her in the arm, the butt and the chest and she hit him on the arms, the stomach and the crotch. After she grabbed him in the crotch and he also grabbed her in the crotch, she hit him in the face. He was angry and grabbed her and held her with a choke hold around her neck. While he choked her, she gasped for air and fought back by grabbing his arms and pulling his hair. She continued to struggle as they walked down the street and after he stopped choking her she "fell limp." He bent over, put her on the ground and slapped her in the face to revive her. He then lifted her shirt to feel her breast and unsnapped her pants to feel her pubic hair. They were on Central Park Avenue a half-block north of 119th Street at the time and he then saw his brother-in-law, Gregory Tarala, driving south on Central Park. He flagged Gregory down, told him "Gregory, I think I did something wrong here," and showed him where Laura was. Gregory slapped her in the face slightly to try to revive her and they then carried her to Gregory's car. They drove to a forest preserve at 139th and Division near the Little Calumet River where Gregory helped him carry Laura about 30 feet into the forest preserve. Gregory walked back to his car and defendant carried Laura about 100 yards further where he covered her with branches and leaves. Gregory went home after dropping him off at the Frosty Mug on 116th and Pulaski. Defendant called his brother to tell him he was going home and, when he arrived, his mother, sister and brother-in-law were sitting at the table. He was told to call the victim's mother and, when he did

so, he told her that he did not know where Laura was. Later that evening, he also spoke to Laura's stepfather at his house and told him that he did not know where Laura was. Gregory left the house at one point but he returned at 1:00 a.m. and he and Gregory then went back to make Laura's death look like an accident. He undressed her, bunched up her clothes and threw them into the river. After he put Laura in the river, he went back to wait for Gregory to pick him up. On the drive home, they discussed not saying anything about the incident. It was Gregory's idea to put Laura in the water."

Reilly also testified that defendant demonstrated the choke hold he used on the victim as he dragged her down Central Park Avenue, and Reilly demonstrated that hold for the trial court.

It was stipulated that William Giese observed a body near the Ashland Avenue bridge on the Cal-Sag Channel at approximately 3:45 p.m. on May 5, 1983. He contacted the police and the body was subsequently removed from the Cal-Sag Channel at a point just west of the Division Street bridge.

It was also stipulated that a toxicologist for the Cook County medical examiner's office performed a chemical test on the victim's blood which was negative for, among other chemicals, opiates, barbiturates, and amphetamines.

Donna Stanley, defendant's mother, testified that her daughter Kathy and her husband, Gregory Tarala, moved into her home around May 1, 1983, and stayed until October 1983 in order to save money to buy a house. Mrs. Stanley had been separated from defendant's father for 13 years and had disciplinary problems with defendant. When Gregory married into the family, he acted like an older brother to the children and although Mrs. Stanley was the disciplinarian when she was home, she gave Gregory permission to function as such in her absence.

Defendant, who was 16 at the time of the incident, testified that he knew the victim from high school and that they were good friends. He did not kill her nor did he help anyone kill her. On April 24, 1983, he and the victim were on their way to "get high" at a place used by local teenagers called "the pit" when Gregory Tarala drove by between 8:30 and 9 p.m. At that time, they were between 117th and 118th on Central Park, a residential area. After Laura drove off with Gregory, defendant went alone to the pit and later to Taco Bell. He called his brother to tell him that he was going home and then stopped at a friend's house for a few minutes, arriving home at approximately 9:45 p.m. He went to bed after taking a shower but his mother awakened at

1 a.m. to tell him that Gregory was coming over because the victim's stepfather had asked him where Laura was. He then went with Gregory to the forest preserve at 138th and Division where they walked down a little path until they reached the water where Gregory showed him a female body. Gregory told him that he and Laura had gone to get some marijuana but stopped to do a little drinking and when he tried to make a pass at her, she "would not go for it" and ran away. Gregory said he caught her and put his hand over her mouth because she was screaming and when she didn't stop, he stuck her head in the water. Gregory then pulled a gun from his pocket, pointed it at defendant and told him that he would end up like Laura if he said anything. Gregory also threatened harm to defendant's family and friends and told him what he should tell the police in case either of them was arrested. Defendant signed the statement he gave to the police because he did not want Gregory to harm his family. He saw Gregory at the Markham courthouse on the day of his arrest and while he realized that he could be charged for murder he felt that his family was more important to him than the murder charge.

On cross-examination defendant stated that he had been friendly with the victim for four or five years and although she had visited his house at least 100 times he had never had a date with her. Gregory, whom Laura knew as defendant's married brother-in-law, was present during some of those visits. Defendant went over to Laura's house on April 24, 1983, to ask her parents if she could go to a teen club meeting with him. He thought there was a teen club meeting at the time when he asked for permission but he later learned that there was no meeting that evening. When Laura's parents refused to permit Laura to go to the meeting because she was "grounded," he told her that he was going to smoke "a couple joints" and drink some beer and that he would wait for her in the alley across the street. She said she would try to get away to meet him but he didn't tell her then that he would introduce her to someone named Jim from a juvenile home. Defendant met Laura in the alley sometime after 8:30 p.m. and when she asked him what he had, he told her of a six-pack of beer in a bag underneath some bushes at the pit which he had put there the night before and when he said that his friend Dave might have "a little reefer," she said, "let's go." They crossed through a few yards and finding that his friend was not at home, they turned back. He never gave Laura a pill and he made up the story he gave in his statement about giving her a pill and having a fight with her. He said they were on Central Park headed south when Gregory called defendant over to his car and asked who the girl was with him and whether he could meet her. Laura

agreed to meet Gregory and walked over to his car where they talked for about 10 minutes and she then got into the car. Gregory told defendant that they were going to get some marijuana and that he should wait for them there but he said he would wait at the pit. When Laura left with Gregory she told defendant that she would be back shortly. He then went to the pit where he drank four cans of beer, and when they didn't return he went to Taco Bell on 116th and Pulaski. After leaving there he called his brother from a pay telephone and then walked home, arriving there at about 9:45 or 9:50. He returned a call from Laura's mother inquiring about Laura, telling her that he did not know where Laura was and lied to her when he said that he had not seen Laura since he left their house at 7:30. Gregory was at home when he called Laura's mother but he had no conversation with Gregory before making the call. After talking to Laura's mother he took a shower and went to bed until he was awakened when Laura's stepfather came to their home sometime after midnight to inquire about her. Defendant told him that he had not seen Laura. Later, after Gregory threatened defendant with a gun in the forest preserve and warned him not to tell anyone what had occurred, Gregory made up the story about the pill and the subsequent struggle with Laura for him to tell the police. Defendant testified that, although he gave the made-up story in his court-reported statement, he initially tried to tell Officer Adamski that it was Gregory who killed Laura, telling him that after getting into a car with Laura and Gregory, they drove to 136th and Division where Gregory killed Laura and forced defendant to put her body into the Little Calumet River. Defendant stated that he lied to Laura's parents about not seeing her after leaving their home, not to cover up a murder, but because he did not want them to know that she had been out buying drugs with Gregory Tarala.

OPINION

■ Defendant maintains that he was not proved guilty beyond a reasonable doubt. It is well established that an extrajudicial confession is insufficient to support a conviction unless corroborated by other evidence (*People v. Avery* (1980), 88 Ill. App. 3d 771, 410 N.E.2d 1093), and, in Illinois, proof of the *corpus delicti* satisfies the corroboration requirement (*People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 603, 467 N.E.2d 1098, citing *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861). It is sufficient if the evidence other than the confession "either tends to show that a crime did in fact occur, that is, to establish the *corpus delicti* [citation], or otherwise sufficiently corroborates the confession in its material elements to satisfy the court that the

confession was not the product of imagination. [Citation.]" (*People v. Avery* (1980), 88 Ill. App. 3d 771, 777, 410 N.E.2d 1093, 1098.) Defendant contends here that the State failed to prove the *corpus delicti* beyond a reasonable doubt.

In a murder case, the *corpus delicti* consists of two items: the fact of death and the fact that death was caused by the criminal agency of some person. (*People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 467 N.E.2d 1098.) *Corpus delicti* does not in itself include the identity of the individual who committed the crime. (*People v. Manske* (1948), 399 Ill. 176, 77 N.E.2d 164.) While defendant argues in support of his contention that the State did not prove that the victim's death was caused by criminal agency where the medical examiner testified that he could not rule out natural death, we note that the *corpus delicti* may be established despite inconclusiveness of the medical testimony with respect to the cause of death. (*People v. Milner* (1984), 123 Ill. App. 3d 656, 463 N.E.2d 148.) Here, the medical examiner also testified that his findings were consistent with death by strangulation of the type admitted to by defendant in his confession. Additionally, the victim was nude when she was found in the Cal-Sag Channel and the toxicologist testified that her blood was negative for opiates, barbiturates, and amphetamines. We find that the evidence proved the *corpus delicti, i.e.,* the fact of death and that the death was caused by some criminal agency, beyond a reasonable doubt.

Defendant also contends that his conduct constitutes, at most, voluntary manslaughter and his murder conviction should therefore be reduced. The portion of the voluntary-manslaughter statute relied upon by defendant refers to "acting under a sudden and intense passion resulting from serious provocation by *** the individual killed." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)(1).) Defendant correctly argues that mutual combat is one of the recognized categories of serious provocation (see *People v. Fausz* (1983), 95 Ill. 2d 535, 449 N.E.2d 78), but whether an altercation constitutes sufficient provocation to reduce a conviction of murder to one of voluntary manslaughter is an issue to be resolved by the trier of fact (*People v. Dowdell* (1980), 84 Ill. App. 3d 707, 406 N.E.2d 123), and a reviewing court will not upset the trier of fact's finding unless the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt of defendant's guilt. (*People v. Middleswart* (1984), 124 Ill. App. 3d 35, 463 N.E.2d 1050.) The voluntary manslaughter statute also provides that "[s]erious provocation is conduct sufficient to excite an intense passion in a reasonable person" (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)), and the test is therefore an objective one (see *People v. Matthews* (1974), 21 Ill. App. 3d

249, 314 N.E.2d 15). Defendant here relies on his confession, repudiated by him at trial, to provide evidence of sufficient provocation. In this confession, defendant stated that he and the victim were arguing and fighting as they walked down Central Park Avenue, and he responded affirmatively when the assistant State's Attorney asked him whether he was "mad" when the victim hit him in the face.

■ The proper inquiry, however, is not whether the defendant was angry at the victim but whether the conduct of the victim reached the level of serious provocation that is required to reduce the killing to manslaughter. (*People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270.) The provocation must be proportionate to the manner in which the accused retaliated. (*People v. Neal* (1983), 112 Ill. App. 3d 964, 967, 446 N.E.2d 270, citing *People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15.) Here, in his confession defendant said: "After Laura took the pill, they began to argue and fight as they walked down Central Park Avenue because Laura complained about the lousy taste of the pill. He hit her in the arm, the butt and the chest and she hit him on the arms, the stomach and the crotch. After she grabbed him in the crotch he also grabbed her in the crotch and she hit him in the face." He then said that "he was angry and grabbed her and held her with a choke hold around her neck. While he choked her she gasped for air and fought back by grabbing his arms and pulling his hair." He then said "she continued to struggle as they walked down the street and after he stopped choking her, she went limp." The "mutual combat" as described by defendant, seems somewhat akin to the mutual "pushing and shoving" in *People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406, where the court upheld the trial court's finding by holding that the limited degree of shoving and pushing did not amount to the type of mutual combat needed to constitute a serious provocation. In *People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748, the court held that attempting to seduce a defendant, hitting him with a paintbrush and brandishing a steak knife did not constitute sufficient provocation to reduce a murder charge to voluntary manslaughter by reason of sudden and intense passion. In the present case, we do not believe that the scuffling and fighting of two teenagers as they walked down the street constitutes sufficient provocation to justify a reduction to voluntary manslaughter, particularly in light of the fact that defendant said he continued to choke her despite her struggling and gasping for air until she went limp and could not be revived. Although defendant argues that the State should have asked him whether he had injuries as a result of the fight, we find such argument to be without merit where defendant repudiated his statement which included the

reference to the "fight" and instead testified at trial that he was not even present when the victim was killed.

Defendant also argues that his alleged attempt to revive the victim showed that he was under great stress and excitement when he choked her and his actions were therefore the actions of "a young man acting under intense passion." We are not particularly moved by this argument since his only attempt to revive her was to slap her face once, after which he said that he lifted her shirt and felt her breast and then unsnapped her pants to feel her pubic hair, actions not indicative of an intent to revive her. Defendant stated that he then saw Gregory driving by and flagged him down and together they hid the body. After defendant lied to both of the victim's parents, he returned to strip the victim and throw her body into the river in order to "make it look like an accident." In addition to the complete lack of serious provocation to choke the victim to death, we find that defendant's statement indicates that he was not acting under intense passion. See *People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270 (defendant's actions after the homicide were strongly contrary to his claim of frenzied passion).

Moreover, while in his confession, defendant said that he and the victim began arguing and fighting about the taste of a pill he had given her, it was stipulated at trial that the victim's blood tested negatively for chemical substances and defendant subsequently stated that he had made up the story about the pill and the subsequent fight. Such an admission is certainly consistent with defendant's repudiation of his entire earlier confession but we note that the record, which is replete with such inconsistencies, weighs heavily against his credibility. We therefore find no reason to disturb the trial court's finding that defendant was guilty of murder.

■ Defendant finally contends that his 30-year sentence was excessive because it failed to sufficiently consider his background, the nature of his actions, and his rehabilitative potential. A sentence of not less than 20 years but not more than 40 years may be imposed for a conviction of murder. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(a).) Here, defendant's sentence was within the proper range and it is well established that a reviewing court will not disturb a trial court's sentencing decision absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Defendant refers us to *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606, in which this court held that the trial court's failure to consider a defendant's rehabilitative potential was an abuse of discretion. Here, however, defendant stated at his sentencing that he was contemplating suicide and the presentence investigation indicated that he had been

seeing a school psychiatrist since fourth grade. The report also indicated that he had a history of substance abuse; that he was drunk at least three or four times a week; and that he would drink "anything he can get his hands on." The trial court specifically referred to defendant's drinking problem when it pronounced sentence, and we therefore cannot find that the trial court failed to consider his rehabilitative potential.

██ Additionally, defendant argues that the mittimus should be corrected where the trial court found that the convictions of aggravated kidnaping and unlawful restraint were merged. The State correctly indicates in its brief that the unlawful-restraint conviction should be vacated because it is merged into the aggravated kidnaping conviction as a lesser included offense (see *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Hopkins* (1982), 107 Ill. App. 3d 422, 437 N.E.2d 722), but requests this court to remand the aggravated-kidnaping conviction for imposition of sentence. We note that the trial court did not actually find that the offense itself merged into the murder conviction but merely that "the sentence that covers the murder will include all of the lesser offenses." A reviewing court has the authority to remand for entry of sentence on a conviction for which no sentence has been imposed by the trial court as long as the cause is properly appealed from a final judgment of conviction on another offense. (*People v. Baker* (1980), 85 Ill. App. 3d 661, 406 N.E.2d 1152.) Since the defendant here properly appealed his murder conviction, we therefore remand the aggravated-kidnaping conviction for imposition of a sentence as requested by the State.

For the aforementioned reasons, we affirm the convictions and sentences for murder and concealment of a homicidal death; vacate the conviction for unlawful restraint; and remand for sentencing on the aggravated-kidnaping conviction.

Affirmed in part; vacated in part and remanded for sentencing.

PINCHAM and MURRAY, JJ., concur.