THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
GREGORY TARALA, Defendant-Appellant.

First District (5th Division)   No. 85—1487

Opinion filed March 13, 1987.—Rehearing denied April 10, 1987.

PINCHAM, J., dissenting.

Fredrick P. Aprati, Jr., Ltd., of Chicago Heights, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr.,
and Sharon L. Gaull, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a bench trial, the defendant, Gregory Tarala, was convicted of concealment of a homicidal death (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.1) and sentenced to a term of five years. He appeals, contending that the trial court abused its discretion by imposing the maximum sentence because he is a person of good character with no prior record.

The evidence at trial showed that on April 24, 1983, the 15-year-old victim, Laura Williams, spoke to Thomas Stanley in her home, and left about 15 minutes later. When she had not returned home at 11 p.m., her stepfather, Roy DiGuido, reported her missing to the sheriff's police. He testified that around April 30, 1983, he saw the defendant, who was a brother-in-law of Thomas Stanley, and men-

tioned his missing stepdaughter, but the defendant did not say anything. DiGuido said he next saw his stepdaughter when he viewed her body on May 5, 1983.

Deputy Sheriff McQuaid said he investigated the victim's death and talked to the defendant at Thomas Stanley's residence on May 6, 1983, but he did not receive any information. A continuing investigation resulted in the arrest of Thomas Stanley on November 9, 1983, at which time McQuaid again talked to the defendant, who signed a statement taken by a court reporter.

Assistant State's Attorney Reilly testified that the signed statement recited that on April 24, 1983, at approximately 9 p.m., the defendant was driving in the vicinity of 119th and Central when he saw his brother-in-law, Thomas Stanley. Stanley told the defendant that he must have done something he should not have, and took him to the victim, who was lying in some bushes with her sweater open and her pants unbuttoned. The defendant was not sure whether the victim was alive or not. They put her on the back seat of the car, where the defendant sought to detect a pulse or heart beat, and when he got no response he applied mouth-to-mouth resuscitation to no avail. He and Stanley then drove to the forest preserve, where Stanley dumped the victim's body and covered it with some underbrush. At 1 a.m., the defendant again drove Stanley to the spot where the victim's body had been placed and told him to put the body in the water so that it could be more easily found. Stanley complied.

It was then stipulated that an autopsy on the victim's body showed that the cause of death was asphyxiation consistent with drowning or choking, but the examiner "could not tell which was the cause."

At the sentencing hearing, it was stipulated that during the pendency of the above proceedings, the defendant was arrested on gambling charges upon the execution of a search warrant, and that records of wagers were found on the premises and on the defendant.

In mitigation, testimony was given by Suzanne Griffin and Donna Stanley, the defendant's mother-in-law, that the defendant was a man of good character with no prior record; that his mother-in-law was raising eight children alone, one of whom was Thomas Stanley, and that the defendant was a father figure to them, often assisting in matters of discipline. They testified that the defendant was not a violent person and that he acted out of concern for his mother-in-law.

On appeal, the defendant contends that his sentence should be reduced because the imposition of the maximum sentence upon him was an abuse of discretion. He maintains that the trial court relied on con-

jecture that the deceased was alive when put in the back seat of his car, and that the sentence was imposed as a deterrent to others without regard to the fact that he had no prior record, rather than consistent with the ends of justice.

■ In determining a sentence, the trial court is authorized to consider not only the defendant's character, but also the nature and circumstances of the offense, and it may further consider the defendant's social environment, habits and age. (*People v. Requena* (1982), 105 Ill. App. 3d 831, 838, 435 N.E.2d 125.) The trial court is the appropriate forum to determine a suitable sentence, and the trial judge's decisions with regard to sentencing must be accorded great deference and weight. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) Further, the trial court may search anywhere, within reasonable bounds, for facts which tend to aggravate or mitigate the offense, and this inquiry is limited only by the prerequisite that the information considered be accurate and reliable (*People v. Meeks* (1980), 81 Ill. 2d 524, 535, 411 N.E.2d 9), and it may also consider pending charges against a defendant (*People v. Bey* (1972), 51 Ill. 2d 262, 267, 281 N.E.2d 638).

■ Here, the trial court commented upon the circumstances surrounding the facts in this case and the impact upon the social environment in the community. Further, although the defendant had no prior record, the court could properly consider his arrest for gambling charges. We do not find that the sentence imposed was an abuse of discretion, and therefore we will not disturb the sentence on appeal. *People v. Cox* (1980), 82 Ill. 2d 268, 281, 412 N.E.2d 451.

For the reasons given, the judgment of the circuit court of Cook County is affirmed. In accordance with *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that the defendant be assessed $50 as costs for defending this appeal and incorporate it as part of our judgment.

Affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. In my judgment the trial court abused its discretion in imposing the maximum five-year imprisonment sentence on this 28-year-old defendant, who had no prior criminal record and who posed no threat to society, for an offense which did not endanger person or property. Concealment of a homicidal death understandably arouses

emotions, but aroused emotions should not be a factor in determining an appropriate sentence. The five-year imprisonment sentence was two years more than the murderer, Thomas Stanley, received for concealing the victim he killed. In imposing the five-year imprisonment sentence, the trial judge distorted the evidence, created and applied improper standards, and irrationally interpreted the probation and sentencing statutes (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.1, 1005—5—3.2, 1005—6—1, 1005—8—1(a)(6)).

The six-count information in the case at bar charged Thomas P. Stanley and Gregory A. Tarala with murder, aggravated kidnaping, unlawful restraint, and concealment of the homicidal death of Laura Williams on April 24, 1983. A severance was granted, Stanley was tried first and was convicted of the offenses. He was sentenced to imprisonment for a period of 30 years for the murder and 3 years for concealment of the homicidal death. This court affirmed Stanley's convictions in *People v. Stanley* (1986), 146 Ill. App. 3d 912, 497 N.E.2d 496.

The defendant Tarala waived trial by jury and was found not guilty of the alleged murder, aggravated-kidnaping and unlawful-restraint offenses and guilty of the concealment of a homicidal death (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1).

Tarala's involvement in the concealment of the death of Laura Williams was established at trial through his confession. Tarala stated in his confession that on April 24, 1983, as he was driving his car in the vicinity of 119th Street and Central Park Avenue in Chicago he saw Thomas Stanley. Tarala was married to Stanley's sister, Kathy. Tarala stopped and asked Stanley what was going on. Stanley told Tarala that he thought he had done something he should not have done. Stanley accompanied Tarala to some bushes and there he saw Laura Williams lying on her back. The facts surrounding Stanley's killing of Laura are set forth in our opinion in *Stanley*.

Stanley and Tarala put Laura's body in the back seat of Tarala's car. When questioned by the police, Tarala stated in his confession as follows:

"Q. Did you know whether or not she was dead or alive at that time?

A. At that particular time I did not know at that particular time.

Q. After you put her in your car, where did you go?

A. I did not leave right away.

Q. What did you do?

A. She was not breathing, I did not see her stomach mov-

ing, sought a heartbeat, and got nothing. I did something else, too, at that time.

Q. What else did you do?

A. I tried to give her mouth to mouth, and I did not get no response. Then I got in the driver's seat."

Tarala's confession further stated that Tarala then drove to the woods at Thornton Blue Island Road, a forest preserve area. Tarala and Stanley took Laura out of the car to about 20 feet off the road into the woods. Tarala left Stanley and returned to the car. Shortly thereafter, Stanley returned to the car and told Tarala he had covered the body. Tarala drove Stanley back to the area of 119th Street and Pulaski Road. Tarala went to the home of his mother-in-law, Mrs. Thomas Stanley, whom his wife was visiting.

Later, at about 1 o'clock in the morning, Tarala drove Stanley back to where Stanley had put Laura Williams' body. Tarala's confession continued:

"Q. Why did you go back to where you put the body?

A. I did not think it was proper. I don't know, I was nervous.

Q. For what purpose did you go back to the woods?

A. Put her in the water.

Q. Why did you want to put her in the water?

A. I figured someone would find her that way."

After Tarala arrived back at the forest preserve area, he told Stanley to put the body in the water. Tarala drove around and finally Stanley came out of the woods and told Tarala that he had put the body in the water. They then drove home.

At the close of the State's case, the court sustained Tarala's motion for a directed finding of not guilty and discharged him on the murder, aggravated-kidnaping, and unlawful-restraint offenses. The defense rested and the court found Tarala guilty of the concealment of a homicidal death.

It is provided in section 9—3.1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1(a)) that: "A person commits the offense of concealment of homicidal death when he conceals the death of any other person with knowledge that such person has died by homicidal means." Paragraph (c) states that concealment of a homicidal death is a Class 3 felony. The penalty for a Class 3 felony is not less than two years' and not more than five years' imprisonment. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(6).) The offense is a probationable offense. Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3(a), (b).

At the sentencing hearing Suzanne Katherine Griffin, the maternal aunt of Tarala's wife, Kathy, testified in mitigation. Donna Stanley, Kathy's mother and the mother of Thomas Stanley, also testified in mitigation. Their testimony established that for a period following Tarala and Kathy's marriage they lived with Mrs. Stanley and her eight children, including Thomas Stanley. Mrs. Stanley and her husband were separated and the defendant was like a father or big brother to the children. Since Tarala and Kathy moved they visited Mrs. Stanley and her children in their home about three or four times a week and sometimes on weekends. Mrs. Griffin and Mrs. Stanley testified that Tarala was not a violent person, that he had felt and shown remorse, and that they did not think that Tarala would be a threat to the community if placed on probation. Mrs. Stanley also testified that she was of the opinion that Tarala aided her son Thomas in concealing Laura Williams' body because he thought that the shock of Stanley's having killed Laura might kill her or send her to the hospital and that Tarala was very concerned about her.

In response to the court's inquiry if he had anything to say before imposition of sentence, Tarala stated:

"All I was trying to do is protect my mother-in-law and her family. What I did was wrong. I did not have any intention of causing anybody any grief and anguish or anything, especially the Williams' family or anybody at all. I made a big mistake, I know that. I'm sorry."

Before imposing the maximum five-year imprisonment sentence, the trial court stated:

"All right, as required by law, of course, I shall consider many factors in determining what a fair sentence is and attempt to strike a balance between the possible rehabilitation potential of a defendant and the debt of society for the offense which he committed."

The trial court's criteria for determining the sentence to impose "to strike a balance between the possible rehabilitation potential of a defendant and the debt of society for the offense which he committed" are not the criteria required by law in determining a sentence. The trial court erred in applying these criteria.

There are 12 grounds to be accorded weight in favor of withholding or minimizing a sentence of imprisonment set forth in section 5—5—3.1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1(a)), which states:

"The following grounds shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

(1) the defendant's criminal conduct neither caused nor threatened serious physical harm to another;

(2) the defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another;

(3) the defendant acted under a strong provocation;

(4) there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(5) the defendant's criminal conduct was induced or facilitated by someone other than the defendant;

(6) the defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained;

(7) the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime;

(8) the defendant's criminal conduct was the result of circumstances unlikely to recur;

(9) the character and attitudes of the defendant indicate that he is unlikely to commit another crime;

(10) the defendant is particularly likely to comply with the terms of a period of probation;

(11) the imprisonment of the defendant would entail excessive hardship to his dependents;

(12) the imprisonment of the defendant would endanger his or her medical condition."

The defendant complied with 9 of the foregoing 12 mitigating factors. Those nine factors and the trial judge's comments and findings thereon are as follows:

Mitigating factor No. 1:

"the defendant's criminal conduct neither caused nor threatened serious physical harm to another."

In the absence of any evidence the trial court erroneously concluded, "it is quite obviously [*sic*] that factor is not present." There is no evidence in the record that the defendant's conduct caused or threatened serious physical harm to another.

Mitigating factor No. 2:

"the defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another."

The trial court mistakenly concluded: "It is quite obvious that factor

is not present here." Here again, there is no evidence in the record from which it can be inferred that the defendant contemplated that his criminal conduct would either cause or threaten any physical harm to anyone.

Mitigating factor No. 3:

> "the defendant acted under a strong provocation."

The trial court erroneously found "absolutely no evidence whatsoever of any degree of provocation. So that factor is totally missing." When provocation is considered as synonymous to inducement, motivation, reason or incitement, then there was an abundance of provocation in the case at bar. The homicide offender was Tarala's brother-in-law, Thomas Stanley. Tarala was married to Stanley's sister, had lived with Stanley's mother and was a surrogate parent to Stanley and his six younger sisters and brothers. Tarala acted under a strong inducement and motivation to aid his brother-in-law and he acted out of concern for the welfare of his mother-in-law.

Mitigating factor No. 4:

> "there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense."

With regard to this mitigating factor, the trial court stated, "I suppose the defense would want me to believe that this alleged motivation argument that he feared for the welfare of Donna Stanley [Tarala's mother-in-law] and didn't want to cause her any grief. And I submit, it doesn't even come near the category." The substantial grounds tending to justify the defendant's criminal conduct, on which the defendant relied in mitigation, were his brother-in-law's requests for assistance, and because of his relationship with the offender and the offender's mother, the defendant succumbed.

Mitigating factor No. 5:

> "the defendant's criminal conduct was induced or facilitated by someone other than the defendant."

To this mitigating factor the trial court simply responded, "That is not really true here when you're considering just for what I am about to sentence this gentlemen for, to wit: concealment." The evidence established that the defendant's criminal conduct, *i.e.*, his aiding in the concealment of the homicide, was induced by the homicide offender, Thomas Stanley.

Mitigating factor No. 6:

> "the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime."

Although Tarala had no history of prior delinquency or criminal activity and had led a law-abiding life for his entire life before the commission of the present crime, the trial court commented, "I believe I have already commented on that in my remarks relative to aggravation."

Mitigating factor No. 7:

"the defendant's criminal conduct was the result of circumstances unlikely to recur."

Although aiding in the concealment of a homicidal death is an extremely rare offense and is unlikely to recur with the defendant, the trial judge rationalized, "I don't think that [mitigating factor] is present here. It isn't a question of a man panicking in this situation. *It's a question in this court's opinion of true malice aforethought once he discovered the body.* He knowingly and intentionally did what he wanted to do. I think if faced with a similar situation—*If he did that to someone allegedly so close to him, why would he not do it again to someone not so close.*" (Emphasis added.)

There is not one iota of evidence in the record that the defendant acted with "true malice aforethought once he discovered the body," or that the defendant would "do it again to someone not so close." The court's rationale in rejecting this mitigating factor is unsupported by the evidence.

Mitigating factor No. 8:

"the character and attitude of the defendant indicates that he is unlikely to commit another crime."

Regarding this factor, the trial court simply stated, "I can't say either way." It is quite clear that the defendant's character and attitude indicated that he was unlikely to commit another crime.

Mitigating factor No. 9:

"the defendant is particularly likely to comply with the terms of probation."

The trial court stated, "The biggest factor is that under the statute this gentleman is eligible for probation. And the case law is quite clear that eligibility for probation should be considered strongly by a court unless there is something that dictates strongly against it. To deny probation when probation is presumed eligible the court must enter, or come to a finding that in fact to grant probation would totally deprecate the seriousness of the offense and be inconsistent with the ends of justice. And unfortunate for Mr. Tarala, I find that that is 100 per cent the case in this case; that this offense is very serious. *So to send a message to the People of the State of Illinois that you can conceal a homicidal death and get probation would totally deprecate*

*the seriousness of the offense.* And I can in no manner see how it can even be consistent with the ends of justice." (Emphasis added.)

Tarala was confronted with the dilemma of either denying or granting his brother-in-law's request for assistance. He chose the latter. In doing so he exercised poor judgment, the execution of which was illegal. But Tarala's conduct does not indicate a cold, calloused and indifferent criminal mentality. The defendant attempted to revive the deceased by mouth-to-mouth resuscitation but got no response. The deceased was not breathing and her stomach was not moving. The defendant sought her heartbeat but "got nothing." It was only after his efforts failed that the defendant drove Stanley, his brother-in-law, and the deceased to an isolated area where Stanley concealed the body. Later, out of his concern that the deceased's body would not be discovered, the defendant drove Stanley back to the concealed body and prevailed upon Stanley not to leave the body hidden under the bush where it possibly would not be found, but to put the body in the water where it would be discovered. Stanley, not the defendant, uncovered the body and put it in the water.

The defendant's involvement in the concealment of the body was peripheral. The trial judge's "message to the People of the State of Illinois that you can conceal a homicidal death and get probation would totally deprecate the seriousness of the offense" is contrary to the State legislature's determination and message to the People that the offense of concealment of a homicidal death is probationable.

Concealment of a homicidal death is a Class 3 felony and is a probational offense. Section 5—6—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—6—1(a)) provides:

"Except where specifically prohibited by other provisions of this Code, the court *shall* impose a sentence of probation or conditional discharge upon an offender unless, having regard to the nature and circumstances of the offense, and to the history, character and condition of the offender, the court is of the opinion that:

(1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or

(2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." (Emphasis added.)

This statute does not confer an absolute right to probation for a defendant who complies with its mandate but, as a guideline for determine a sentence, it strongly militates against the imposition of imprisonment and expressly encourages probation or periodic imprison-

ment as alternatives. The record clearly establishes that the trial court ignored and distorted the evidence and applied inappropriate rationale in rejecting the mitigating factors and the defendant's application for probation when it imposed the five-year imprisonment sentence. The trial court abused its discretion in so doing.

The 11 statutory factors in aggravation which shall be accorded weight in favor of imposing an imprisonment sentence are set forth in section 5—5—3.2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)), which provides:

"The following factors shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the court as reasons to impose a more severe sentence under Section 5—8—1:

(1) the defendant's conduct caused or threatened serious harm;

(2) the defendant received compensation for committing the offense;

(3) the defendant has a history of prior delinquency or criminal activity;

(4) the defendant, by the duties of his office or by his position, was obliged to prevent the particular offense committed or to bring the offenders committing it to justice;

(5) the defendant held public office at the time of the offense, and the offense related to the conduct of that office;

(6) the defendant utilized his professional reputation or position in the community to commit the offense, or to afford him an easier means of committing it;

(7) the sentence is necessary to deter others from committing the same crime;

(8) the defendant committed the offense against a person 60 years of age or older;

(9) the offense took place in a place of worship or on the grounds of a place of worship, immediately prior to, during or immediately following worship services. For purposes of this subparagraph, 'place of worship' shall mean any church, synagogue or other building, structure or place used primarily for religious worship;

(10) the defendant was convicted of a felony committed while he was released on bail or his own recognizance pending trial for a prior felony and was convicted of such prior felony, or the defendant was convicted of a felony committed while he was serving a period of probation or conditional dis-

charge for a prior felony;

    (11) the defendant committed or attempted to commit a felony while he was wearing a bulletproof vest. For the purposes of this paragraph (11), a bulletproof vest is any device which is designed for the purpose of protecting the wearer from bullets, shot or other lethal projectiles.''

None of these 11 factors in aggravation applied to the defendant. The trial court's findings that 3 of these 11 factors in aggravation were present are unsupported by the evidence. These three factors and the trial court's findings and comments thereon follow.

The first factor in aggravation the trial court considered was:

    "the defendant's conduct caused or threatened serious harm.''

The trial court stated, "There is no question in this court's mind that that factor is overwhelmingly present in this case. *** Mr. Tarala clearly indicated that at the time he and the other man put the body into the car and he did not know whether she was alive or dead at that time. And yet he transported her around the county in that condition. God only knows what additional harm was brought to that young lady during that period of time.''

There is no evidence in the record that the defendant's conduct caused or threatened serious harm. The defendant stated in his confession that after Stanley showed him the body in the evergreen bushes he and Stanley put it in the back seat of the defendant's car. The defendant was then asked by the assistant State's Attorney, "Did you know whether or not she was dead or alive *at that time*?'' The defendant answered, *"At that particular time I did not know at that particular time.''* (Emphasis added.) The defendant was then asked, "After you put her in your car, where did you go?'' The defendant responded that he did not leave right away. He explained, "She was not breathing. I did not see her stomach moving, sought a heartbeat, and got nothing. I did something else, too, at that time.'' The defendant stated: "I tried to give her mouth to mouth, and I did not get no response. Then I got in the driver's seat,'' and drove to the forest preserve. Although the defendant confessed his involvement in the incident, the State did not ask the defendant if he determined if the victim was alive or dead after he was unable to revive her and before he departed for the forest preserve. It thus requires a distortion of the evidence to conclude that the defendant transported her around the county not knowing whether she was dead or alive because he said when he initially put her in his car he did not know at that time whether she was dead or alive. It must be concluded from the defendant's confession that he knew from his futile efforts to revive the de-

ceased and his examination of her that she was dead when he transported her body to the forest preserve. Moreover, if the trial court was of the opinion that the evidence established that the victim had not expired when the defendant transported her to the forest preserve, then pursuant to the accountability statutes (Ill. Rev. Stat. 1985, ch. 38, pars. 5—1, 5—2, 5—3) the defendant was guilty of the aggravated-kidnaping, unlawful-restraint and murder offenses and the trial court should have so found. Furthermore, the trial court's speculations that "God only knows what additional harm was brought to that young lady during that period of time [when she was being taken to the forest preserve]" and "Laura, a victim, possibly rode around in a car suffering beyond belief because she still had some embers of life within her," had no evidentiary support in the record.

The trial court further speculated, "It is not that unreasonable an inference that possibly he could have saved that young lady's life by taking her to a hospital or calling paramedics, or whatever." Again, if the evidence established that the victim had not expired when the defendant drove her to the forest preserve, the trial court should have found the defendant guilty of murder and aggravated kidnaping in addition to concealment of a homicidal death. Having only found the defendant guilty of concealment of a homicidal death, it was inappropriate for the trial court to predicate the defendant's sentence on an unwarranted speculation that "possibly he could have saved that young lady's life by taking her to a hospital or calling paramedics or whatever."

The second factor in aggravation the trial court considered was,

> "the defendant has a history of prior delinquency or criminal activity."

The defendant had no history of prior delinquency or criminal activity and the trial court admitted that the defendant "has really a lack thereof." The court thereafter stated, however, "[B]ut I do happen to agree with the State only as their argument relates to possible rehabilitation potential. And that is simply, does the man truly possess rehabilitative potential who while out on bond on a murder case is engaging in the conduct which his attorney has stipulated and agreed is true; in the area of illegal conduct, to wit: gambling." The fact that the defendant gambled, an activity in which the State engages via a State lottery, while awaiting trial in the instant case is certainly not a barometer of the defendant's rehabilitative potential.

The third factor in aggravation on which the court relied was:

> "the sentence is necessary to deter others from committing the same crime."

Aiding a homicide assailant in concealing a homicidal death appears to be one of the rarest offenses in the criminal justice system. Indeed, the circumstances for the commission of this offense are infrequent. The trial court's interpretation of this factor in aggravation was improperly based on the court's statement, "Well in this court's humble opinion there is no question that you have to impose a strict sentence to get a message to society that we cannot go around concealing homicidal deaths because *** common sense in this court's opinion dictates that the motivation behind that factor is to isolate the individual who caused the death so that he shall never be apprehended for prosecution. And society cannot stand for potential murderers going loose because someone else is successful in isolating him. And people must learn that."

In *People v. Knowles* (1979), 70 Ill. App. 3d 30, 388 N.E.2d 261, the defendant was convicted of two arsons which arose out of his setting a chair in a school dormitory lounge on fire and thereafter throwing a book of matches on a rug near a couch which subsequently caught fire in another dormitory. In *Knowles*, unlike in the case at bar, the defendant's conduct damaged property, could have endangered human safety and life and posed a threat of harm or danger to person or property. As in the case at bar, however, the trial court in *Knowles* refused to impose probation or conditional discharge because to do so would deprecate the seriousness of the offense and would be inconsistent with the ends of justice. Knowles was sentenced to imprisonment for a period of 2 to 12 years. The language of the appellate court in *Knowles* in vacating the sentence and remanding the cause for a new sentencing hearing is applicable to the case at bar. The *Knowles* court stated:

> "The theory of punishing one individual to deter other would-be offenders is at best of questionable value and is frequently used as a disguise for retribution and retaliation. 'Furthermore, to make an example of an offender so as to discourage others from criminal acts is to make him suffer not for what he has done alone but because of *other* people's tendencies.' Menninger, The Crime of Punishment 206 (1968).
>
> When a defendant poses no threat to society and when, as the presentence report indicates here, adequate resources are available in the community to provide any needed rehabilitation, to place a youthful offender in a penitentiary where bitterness and anger breed is not even tangentially related to the ends of justice. The defendant bears the stigma of being a convicted felon, but to impose upon him the additional disgrace of

having to serve a sentence of imprisonment for the sole purpose of deterring others from criminal acts is inconsistent with the ends of justice. *** [B]y imprisoning him for 2 to 12 years so that others can learn from his mistakes is misguided at least and counterproductive as a long-range remedy." (Emphasis in original.) 70 Ill. App. 3d 30, 33-34.

In *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 364 N.E.2d 491, the defendant was convicted of murder arising out of the defendant's shooting the victim when the victim answered a knock at the door. It was the State's theory that the murder was rival-gang motivated and related. The defendant was sentenced to an imprisonment term of 50 to 100 years. This court held that the trial court abused its discretion in imposing the sentence and reduced the sentence to 15 to 45 years' imprisonment. In so doing this court stated that the case called for a careful assessment of the trial court's lack of appreciation of the mandate of article I, section 11, of the Illinois Constitution of 1970, which provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, sec. 11.) This court stated that this constitutional mandate not only requires the trial judge to consider the defendant's rehabilitation and restorative factors, but that the trial judge must also act on it as an objective of the sentence. (49 Ill. App. 3d 644, 648.) This court further stated in *Gibbs* that the trial judge may not resign to total retribution one who has a chance of future restoration to useful citizenship in the free society. In reducing Gibbs' sentence this court pointed out the defendant's youth, his steady employment and support of his parents with whom he lived and the defendant's lack of a criminal record.

In *People v. Steffens* (1985), 131 Ill. App. 3d 141, 151, 475 N.E.2d 606, this court again commented on a trial court's abuse of discretion in imposing sentence in the following language:

"[A] trial court's sentencing decision will not be disturbed absent an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882). An abuse of discretion may be found even where the sentence is within the statutory limitations, however, if that sentence is greatly at variance with the purpose and spirit of the law. [Citation.] The Illinois Constitution requires that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship' ***.

In *Gibbs*, we stated that the constitutional mandate requires

that the trial court actually consider rehabilitation as an objective of the sentence."

The court concluded in *Steffens* that from the facts of the homicide, the defendant's age and lack of a significant criminal record, the defendant's rehabilitative potential was not given adequate consideration. Under the authority of Supreme Court Rule 615(b)(4), the defendant's sentence was reduced.

For the reasons I have stated, this court should reduce the defendant's five-year imprisonment sentence or vacate the sentence and remand the cause to the trial court with directions to conduct a new sentencing hearing and impose a new sentence in accordance with the views expressed herein. The five-year imprisonment sentence of this defendant, whose involvement in the concealment of the body of the deceased was peripheral, was two years greater than the three-year imprisonment sentence imposed on the offender who concealed the deceased's body and who committed the murder. Tarala's sentence violates his constitutional right to equal protection of the law under the fourteenth amendment to the Constitution of the United States, article I, section 2, of the Constitution of the State of Illinois and article I, section 11, of the Illinois Constitution, which provides, in pertinent part, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (See *United States v. Wiley* (7th Cir. 1960), 278 F.2d 500.) When the 1987 budget of the Illinois Department of Corrections for maintaining the 19 adult felony prisons under its jurisdiction, $397,926,600, is divided by the number of inmates who were confined in those prisons as of February 19, 1987, 18,800, the total cost for one year's imprisonment for each felony inmate in this State is more than $21,219.[1] These funds would be far better spent to incarcerate offenders who have threatened, harmed, endangered, or who pose a threat of harm or danger to person or property.

---

[1]These figures were obtained from the Illinois Department of Corrections, Springfield, Illinois.